E-FILED
Friday, 09 September, 2011  09:44:42 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PATRICIA ANN EARL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-3224 |
| | ) | |
| H.D. SMITH WHOLESALE DRUG, | ) | |
| CO., and JOHN D'AMARO, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

On October 10, 2008, Plaintiff Patricia Ann Earl filed a Complaint alleging gender discrimination in violation of the Equal Employment Opportunity Act (42 U.S.C. § 2000(e), *et seq.*) (Title VII) and several state law claims.  The matter is now before the Court on Defendant H.D. Smith Wholesale Drug Company's (H.D. Smith) Motion for Summary Judgment (d/e 74) and Defendant John D'Amaro's Motion for Summary Judgment (d/e 79).  For the reasons that follow, H.D. Smith's Motion for Summary Judgment is granted with respect to Counts I and II.  Because the Court declines to exercise supplemental jurisdiction over Earl's state law claims, Counts III, IV, VI, and VII are dismissed without prejudice and D'Amaro's Motion for Summary Judgment is denied as moot.

## FACTS PRECEDING THE LAWSUIT

Earl began working for H.D. Smith in 2005 as Vice President of Drug Divisions.  In 2006, Earl became H.D. Smith's Vice President of Insitutional Marketing, at which time she entered into an Executive Employment Agreement with H.D. Smith.

At all relevant times, Defendant D'Amaro was employed by H.D. Smith as the Chief Financial Officer (CFO).  D'Amaro's primary responsibility was the financial representation of the company.  He was also responsible for reviewing contracts to ensure that the right business issues were addressed in them.  Dale Smith is the Chairman of the Board and Chief Executive Officer (CEO).  Smith was D'Amaro's direct superior.

In 2007, H.D. Smith began negotiating a contract[1] with a Pennsylvania-based hospital system for drugs and other pharmaceutical products.  The hospital system included Lehigh Valley Hospital and Health Network (Lehigh Valley) and Health Spectrum Pharmacy Services.  Earl was involved in these negotiations.  The Lehigh Valley Contract was expected to generate sales of six-to-seven million dollars a month.

---

[1] Like the Parties, the Court will refer to "the contract" (or Lehigh Valley Contract) even though there were two virtually identical contracts.

By late 2007, H.D. Smith and Lehigh Valley had been negotiating the Lehigh Valley Contract for several months.  Earl was charged with managing the final revisions.  It was Earl's responsibility to work through the final revision process and get the necessary signatures.  Earl's counterpart during this process was Ann Faust, Lehigh Valley's Contract and Product Manager.

On November 27, 2007, Earl sent what she characterized as "executable contracts" requesting Faust to have each of the contracts signed and returned.  On January 23, 2008 at 3:11 p.m., Dale Bergman – H.D. Smith's Finance Director in the division in which Lehigh Valley is located – sent an e-mail to D'Amaro, Earl, and others in which he stated that Lehigh Valley was preparing to sign the contract.  Earl read that e-mail.  In the same e-mail, Bergman also stated that he believed the Lehigh Valley Contract would have to be signed by Smith due to H.D. Smith's "Signing Authority policy."  Under the signing authority policy, Smith was the only one authorized to sign the Lehigh Valley Contract for H.D. Smith because of the dollar amount of the contract.

On January 26, 2008, at 12:40 p.m., D'Amaro sent an e-mail to Bergman, Smith, and Earl regarding changes to be made in the Lehigh Valley Contract.  D'Amaro attached a revised copy of the Lehigh Valley Contract to his email.  The revised contract sent by D'Amaro included several modifications to the contract,

including the following: (a) moved language contained in paragraph 17 of the revised contract from an attachment into the actual document; (b) changed the notice provisions in the document, contained in paragraph 22 at page 7, to indicate that any notice under the contract should be sent to Smith as CEO rather than D'Amaro as CFO; (c) changed the signature page to provide that Smith – rather than D'Amaro – would sign on behalf of H.D. Smith; and (d) added paragraph 29 to permit AR financing.  D'Amaro was not involved in the day-to-day changes made to the Lehigh Valley Contract prior to January 26.

On January 29, 2008, Earl was working in H.D. Smith's facility in Kearny, New Jersey.  At 12:39 p.m. that day, Earl sent an email to Faust in which she stated "tell me what is on your signed page."  At 2:29 p.m., Earl emailed Faust a copy of the contract with "the changes we discussed" and inserted paragraphs 17 and 29 added by D'Amaro.  The email indicated that Earl was "able to keep all pages in the same order as before."  The e-mail stated the contract was the final documents for both sides and requested that Faust print the document and give H.D. Smith a signed contract the next day. Earl indicated she would get the contract signed by H.D. Smith's CFO.

On the morning of January 30, 2008, Earl traveled from H.D. Smith's New Jersey facility to Lehigh Valley for a business meeting.  Prior to the meeting, Earl

and Faust called D'Amaro.  During the call, D'Amaro was told that Faust "had

gotten" the Lehigh Valley

Contract signed and they would be given to Earl.  Later that same day, Faust faxed

a signed copy of the contract to D'Amaro.  After D'Amaro received Faust's fax, he

asked his assistant, Leslie Collins ("Collins"), to review the contract to ensure that

the changes that he had requested on January 26 were included in it.  On January

31, 2008, Collins informed D'Amaro that the signed copy of the Lehigh Valley

Contract that Faust had faxed to him contained some – but not all – of the changes

that D'Amaro had requested in his January 26 email to Earl.  Paragraph 17, for

example, did not include the weekly pay terms which were to have been in the final

contract.  As far as Paragraph 22 is concerned, the name of the person to whom

notice was to be sent had not been changed from D'Amaro to Smith.  Similarly, the

name of the person who was to sign the Lehigh Valley Contract for H.D. Smith

had not been changed from D'Amaro to Smith.  Additionally, the faxed contract

had two paragraphs which were numbered "34."  Finally, the signature page of the

faxed contract indicated that it had been signed by Lehigh's Terry Capuano

("Capuano") on January 23, and there was no indication that Capuano had

authorized or initialed the changes.

    After Collins reported to him, D'Amaro called Earl.  D'Amaro pointed out

that the contract had not been signed on January 30, 2008, as it should have been.

He also observed that, while the contract had a signature page that appeared to

have been signed and dated by Capuano on January 23, the contract included

changes that D'Amaro had not requested until January 26.   Earl told D'Amaro that

she would call Faust to address the situation.  D'Amaro told Earl  not to "involve

the customer" at that point and he would take care of it.

Shortly after her telephone conversation with D'Amaro, Earl sent an email to

D'Amaro in which she explained that the changes that had been made to the

contract were "approved" by Faust.[2]  In the same email, Earl forwarded a previous

email (originally sent to Faust but not D'Amaro) in which she stated: "I was able to

keep all the pages in the same order as before."  In his response to Earl's email,

D'Amaro explained to Earl that the two of them needed to meet to discuss the

various versions of the contract which were "out there."  He stated that H.D. Smith

and Lehigh Valley did not have a signed contract with which he was comfortable.

He also stated that he had left a voicemail message for Faust letting her know that

there was a problem with the contract.

After he spoke with Earl, D'Amaro revised the contract so that it would

---

[2] While Earl acknowledges using the word "approved", she maintains everyone knew
Faust did not have the authority to approve or disapprove of the contract.

include all of the changes that he had requested on January 26, 2008 and a new

signature page.  On February 1, 2008, D'Amaro sent the corrected final contract to

Faust by email so that Capuano could sign the final version.

Earl asked to meet with D'Amaro on February 6, 2008.  During the meeting,

Earl told D'Amaro that what he had said to her over the phone on January 31,

2008, was accusatory.  Earl told D'Amaro that she was disappointed with him for

speaking to her in that way in light of all of the work that she had put in on the

Lehigh Valley Contract.  Earl told D'Amaro that she had expected to be

congratulated for finally getting the contract signed.  Earl indicated that she told

D'Amaro she felt he was demeaning in the way he talked to her and indicated that

the communication may have been just as bad on her part and that they needed to

communicate better.  Earl does not recall talking about any other specifics

regarding the January 31, 2008 telephone conversation during her February 6, 2008

meeting with D'Amaro.  Rather, she recalls discussing the tone in which D'Amaro

had talked to her on January 31.  Additionally,  Earl suggested that she thought

there were some "pricing discrepancies that were occurring at Lehigh Valley"

related to "credit and rebilling."  Earl told D'Amaro he had called her "integrity

into question."  She also stated that she thought D'Amaro's "integrity" was "in

question" because he had not taken responsibility for and resolved the "credit and

rebilling" situation.

On February 7, 2008, D'Amaro met with Smith for their weekly meeting. That meeting was the first meeting during which Smith recalls having communications from D'Amaro regarding Earl and the Lehigh Valley issues. D'Amaro indicated he had been involved in a process to analyze and determine which version of the contract was correct. The primary issue raised regarding Earl during the meeting related to the fact that a proposed contract with a very large hospital system in Pennsylvania had been executed by an authorized individual there and subsequently had been altered. D'Amaro indicated he had reviewed the document and was making Smith aware of that.

D'Amaro informed Smith that the Lehigh Valley Contract "process was compromised in that we [H.D. Smith] received a contract that was signed and that had insertions in it after the date of the signature on the particular contract." D'Amaro also informed Smith that he had reviewed the contract and compared it with the drafts that he had sent to Earl on January 26. D'Amaro and Smith discussed how "it appeared that portions of the [contract] had been altered to mask changes that were subsequent to the signat[ure]." Smith was speaking about changes in the sections of the contract that had to be changed in such a way that they fit into the existing pagination and changes that had occurred at times that

were inconsistent with the time the document had been signed.  D'Amaro informed

Smith that he had sent a revised copy of the contract to Lehigh Valley to be signed.

Later that same day, Smith called D'Amaro back into his office.  Smith told

D'Amaro that he wanted to have Earl come meet with them so that they could

discuss "what occurred with Lehigh Valley to understand from her perspective."

Smith then called Earl and asked her to join them.  Earl joined Smith and

D'Amaro, and Smith asked Earl if she was aware of "the fact that there had been

alterations to the contract after it had been signed."  Smith told Earl that was

"unacceptable" because it put H.D. Smith in a situation where if "the customer

compared the agreement they'd signed with the agreement [that was faxed by Faust

to D'Amaro on January 30, 2008,] that [Smith] would have signed without

[D'Amaro's] intervention, then there wouldn't be any consistency between

th[em]."  Smith believed that what had occurred could "invalidate . . . a significant

contract for the company."  He also was concerned that "it would damage our

credibility and character in terms of an analysis that might occur internally at

Lehigh and their feeling that H.D. Smith had done something underhanded or

unethical."  When asked if she recalled telling Dale Smith that the person who

signed the contract was unaware of the changes, she indicated she may have told

them that because that was the truth.   During the meeting, D'Amaro did not

indicate to Smith that Earl should be terminated.  Nonetheless, Smith terminated Earl's employment.  Smith indicated that he made the decision to terminate Earl on his own.

## THE LAWSUIT AND RELATED ALLEGATIONS

The seven-count Complaint brought allegations against both H.D. Smith and D'Amaro.  Counts I, II, III, and VII involve claims against only H.D. Smith. Counts I and II make the same claim against H.D. Smith for gender discrimination under the Equal Opportunity Act.   Count I seeks declaratory and injunctive relief and Count II seeks monetary damages against H.D. Smith.  Count III is a claim against H.D. Smith for breach of employment contract while Count VII is a claim under the Illinois Wage Payment and Collection Act (820 ILCS 115/1, *et seq*.).

Counts IV and V are against D'Amaro only and allege defamation and intentional infliction of emotional distress respectively.  On June 22, 2009, the Court dismissed Count V.

Count VI alleges intentional interference with the employment relationship and is brought against both H.D. Smith and D'Amaro.  Count VI was dismissed as to H.D. Smith but remains pending against D'Amaro.

H.D. Smith now moves for summary judgment on Counts I, II, III, and VII. D'Amaro moves for summary judgment on Counts IV and VI.

The matter has been fully briefed by the parties.  Defendants have both

requested oral argument on their motions for summary judgment.  The Court has

reviewed the motions for summary judgment and the parties' briefs in support of

and objecting to the motions and has decided that oral argument is unnecessary.

The Court will: grant H.D. Smith's Motion for Summary Judgment with respect to

Counts I and II and decline to exercise supplemental jurisdiction over the

remaining state law claims.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction because Earl's claims in Counts I

and II are based on a federal statute.  <u>See</u> 28 U.S.C. § 1331.  The Court has

jurisdiction over the remaining state claims[3] pursuant to its supplemental

jurisdiction.  <u>See</u> 28 U.S.C. § 1367(a).  Personal jurisdiction exists because the

Defendants' actions took place in Illinois.  <u>See</u> <u>World-Wide Volkswagen Corp. v.

Woodson</u>, 444 U.S. 286, 297 (1980) (personal jurisdiction exists where a defendant

"'purposefully avail[ed] itself of the privilege of conducting activities'" in the

forum state)(quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)).  Venue exists

because both Defendants reside in this judicial district and a substantial part of the

---

[3] The Complaint alleges the state law claims arise from the same set of operative facts giving this Court jurisdiction pursuant to § 1367.  The Complaint does not allege diversity jurisdiction and the damages asked for in each count alleging a violation of state law is "in excess of $50,000."

events giving rise to Earl's claims occurred in this judicial district.  See 28 U.S.C. §1391(b) and (c).

## STANDARD OF REVIEW

"Summary judgment is appropriate when the pleadings and submissions in the record indicate the absence of any genuine issues of material fact, such that the moving party is entitled to judgment as a matter of law."  Mercatus Group, LLC v. Lake Forest Hospital, 641 F.3d 834, 839 (7th Cir. 2011).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  The movant bears the burden of establishing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  If the movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Anderson, 477 U.S. at 252.

In deciding a motion for summary judgment, a court can only consider sworn statements based on personal knowledge and other evidence that would be admissible at trial under the Federal Rules of Evidence.  Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002).  The evidence is viewed in the light most favorable to the non-movant, and "all justifiable

inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Summary judgment is inappropriate when alternate inferences can be drawn from the evidence, as the choice between reasonable inferences from facts is a jury function. Id.; Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). However, conclusory allegations do not create issues of fact which forestall summary judgment. See Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 740 (7th Cir. 2006) (internal citation omitted) ("it is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact").

## ANALYSIS

"Under Title VII, it is unlawful for an employer to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin." Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004). "A plaintiff alleging sex discrimination in employment under Title VII can proceed under either the direct method or the indirect, burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Petts v. Rockledge Furniture LLC, 534 F.3d 715, 720 (7th Cir. 2008) (citing Sartor v. Spherion Corp., 388 F.3d 275, 278 (7th Cir. 2004).

## A.  Earl Has Not Attempted to Show Discrimination Via the Direct Method

There are two ways a plaintiff can prove discrimination via the direct method: (1) direct evidence; and (2) circumstantial evidence.  Goetz v. City of Springfield, 699 F.Supp.2d 1066, 1076 (C.D. Ill. 2010).  Direct evidence consists of either an "outright admission by the decisionmaker that the challenged action was undertaken because of the [plaintiff's gender]" or a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action."  Davis v. Con-Way Transp. Central Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations and citations omitted).  Circumstantial evidence can come in the form of "suspicious timing, ambiguous statements oral or written, [or] behavior or comments directed at other employees in the protected group...."  Dandy v. United Parcel Serv., Inc., 388 F.3d 262, 272-73 (7th Cir. 2004) (quoting Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 1994).  The circumstantial evidence "must point directly to a discriminatory reason for the employer's action" (Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003)) and be "directly related to the employment decision."  Venturelli v. ARC Community Service, Inc., 350 F.3d 592, 602 (7th Cir. 2003) (quotation omitted).

Earl offers no admissions of discrimination and no argument that there is a convincing mosaic of circumstantial evidence of discrimination.  Instead, the

section of Earl's Response to H.D. Smith's Motion for Summary Judgment in

which Earl addresses the Title VII claims[4] focuses solely on whether she was

treated less favorably than a similarly situated employee outside of her protected

class of the female gender.  As will be discussed below, this is an element of the

*prima facie* case of discrimination under the indirect method of proof.  Therefore,

Earl has not argued her claim should survive summary judgment under the direct

method of proof.  Accordingly, Earl's case will be analyzed under the indirect

method of proof.

## B.  Earl Has Not Made a *Prima Facie* Case of Gender Discrimination Under Title VII Using the Indirect Method

For Earl's discrimination claim to survive summary judgment by the indirect

method, she must first establish a *prima facie* case of gender discrimination.

Goetz, 699 F.Supp.2d at 1077.  To establish a *prima facie* case of gender

discrimination, a plaintiff must show that: (1) she is a member of a protected class;

(2) she was meeting legitimate employer expectations; (3) she suffered an adverse

employment action; and (4) similarly situated males were treated better than she

was treated.  Id. (citing Patterson v. Indiana Newspapers, Inc., 589 F.3d 357, 364

(7th Cir. 2009)).

---

[4] The rest of Earl's Response to H.D. Smith's Motion for Summary Judgment and the entirety of Earl's Response to D'Amaro's Motion for Summary Judgment are devoted to Earl's state law claims.

It is undisputed that Earl, as a female, is a member of a protected class.  See Farrell v. Butler University, 421 F.3d 609, 613 (7th Cir. 2005).  Courts have noted that there is often overlap between the factual inquiry relevant to the "legitimate expectations prong" of the *prima facie* case and proof of pretext.  See Kish v. Exelon Generation Co., LLC, 2008 WL 904882, at *3 (N.D. Ill. 2008) (citing Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998)).  That is the case here where H.D. Smith's purported reason for terminating Earl's employment, *i.e.*, her handling of the Lehigh Valley Contract, overlaps with its asserted reason for why Earl failed to meet H.D. Smith's legitimate expectations.  Because of this overlap, the Court will consider the "legitimate expectations prong" as having been satisfied for purposes of the *prima facie* test.  Therefore, to establish a *prima facie* case of gender discrimination, Earl must still show she has suffered an adverse employment action and that similarly situated employees were treated more favorably.  Therefore, this Court will only address these two elements of the *prima facie* case.

**1. Adverse Employment Action**

Although it is unclear from her Response to H.D. Smith's Motion for Summary Judgment, Earl appears to argue she has suffered two adverse employment actions: (1) the termination of her employment; and (2) the denial of a

severance package.  Termination of employment is an adverse employment action.
See Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465-66 (7th Cir. 2002) (stating
examples of an adverse employment action include "termination of employment, a
demotion evidenced by a decrease in wage or salary, a less distinguished title, a
material loss in benefits, [or] significantly diminished material responsibilities").
However, to the extent that Earl is arguing that H.D. Smith's denial of a severance
package to her upon termination her is an adverse employment action, Earl is
incorrect.  See Ting v. Chicago Mercantile Exchange, Inc., 2005 WL 2335584, at
*5 (N.D. Ill. 2005).

    The plaintiff in Ting contended his employer's  decision not to give him as
large a bonus as the employer allegedly promised and the employer's failure to
provide severance benefits were adverse employment actions that were
discriminatory.  Ting, 2005 WL 2335584, at 5.  The court concluded that the denial
of the bonus was not an adverse employment action "because denial of a
discretionary bonus ... is usually not an adverse employment action."  Id. (citations
omitted).  The court also found that even if the plaintiff could meet his *prima facie*
case, his claim would fail because he could not show the articulated reasons for the
denial of his bonus were pretext.  Id.  The court then rejected the plaintiff's claim
that the denial of separation benefits was actionable discrimination for the same

reasons it rejected the plaintiff's claim regarding the bonus.  Id. (citing Helzig v. Loyola University of Chicago, 2004 WL 1881780, at *10 (N.D. Ill. 2004)).  Earl's claim that the denial of separation benefits was actionable discrimination fails for the same reason that the plaintiff's similar claim failed in Ting, *i.e.*, because denial of separation benefits is not an adverse employment action.  Moreover, as will be discussed below, even if this Court were to assume the denial of a severance package were an adverse employment action, Earl cannot prove H.D. Smith's reason for not offering her a severance package was pretext for discrimination.

### 2.  Similarly Situated Coworkers

In her Response, Earl names three allegedly similarly situated males who Earl claims were treated better than she was treated.  Those three males are Danny Avila, John Lundquist, and Larry Neceskas.  To show that a coworker is similarly situated, a plaintiff must establish that the individual is "directly comparable to her in all material respects."  Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).  To present a "similarly situated co-worker", a plaintiff need not produce a "clone".  Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 916 (7th Cir. 2010).  However, in disciplinary cases, a plaintiff must show that the allegedly similar "employees dealt with the same supervisor, were subject to the same

standards, and had engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish their conduct or the employer's

treatment of them." Peele v. Country Mut. Ins. Co., 288 F.3d 319, 330 (7th Cir.

2002) (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir.

2000)). The Seventh Circuit has specifically cautioned that in order to establish a

coworker as "similarly situated", the coworker must be shown to have a

"comparable set of failings." Haywood v. Lucent Techs., 323 F.3d 524, 529 (7th

Cir. 2003).

Earl's argument that Avila, Lundquist, and Neceskas are similarly situated to

her suffers from several defects. First, Earl's Response does not address any of the

factors that courts consider when comparing allegedly similarly situated

employees. Second, with respect to the three employees mentioned in Earl's

Response, Earl either has not shown the allegedly similarly situated employees had

the same supervisor, a comparable set of failings, and/or that they engaged in

similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them. Third, Earl does not

cite to deposition evidence, or any other evidence for that matter, to support her

allegations. Earl's self-serving deposition testimony was not based on her personal

knowledge and is therefore insufficient to defeat summary judgment on its own.

See Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003) (self-serving deposition testimony may be sufficient to defeat summary judgment "[p]rovided that the evidence meets the usual requirements for evidence presented on summary judgment–including the requirements that it be based on personal knowledge and that it set forth specific facts showing there is a genuine issue for trial"); Ware v. LaSalle Bank Corp, 2008 WL 5083127, at *7 ("self-serving beliefs by a plaintiff cannot create genuine disputes where the beliefs are not premised on a personal knowledge or any legitimate basis").

### i. Danny Avila

Earl states Danny Avila was a "vice president division manager for Florida" who reported to Earl.  When pressured to stop abusing his employees, Avila resigned.  Nevertheless, H.D. Smith's Dale Smith allowed Avila to continue working.  According to Earl's Response, "[t]his was despite Smith's knowledge that Avila had, at least, a 'credibility' issue.'"  Although Earl does not cite to her deposition testimony in her Response, Earl testified that she "believe[d]" Avila lied to D'Amaro "about things" and that she "believe[d]" Avila lied to Smith.  She also claimed Avila harassed employees in his division, intimidated them, and erupted into outrages with female employees in the division.  When counsel stated "You don't know what Dale Smith knew about Danny Avila, whether he had lied or not,

you don't have any personal knowledge of that", Earl responded, "No, I don't."

Earl has failed to show Avila was similarly situated to her.  Earl has stated that Avila reported to her.  Therefore, Earl and Avila did not report to the same supervisor.  Moreover, while Earl broadly categorizes Avila's alleged conduct as involving a "credibility issue," Earl has made no showing that Avila's conduct was similar to the conduct that H.D. Smith alleged was the basis for its decision to terminate Earl's employment, *i.e.*, Earl's handling of the Lehigh Valley Contract.  Further, Earl's self-serving deposition testimony that she "believed" Avila lied to D'Amaro and Smith, without more, is not based on her personal knowledge and is therefore insufficient to thwart summary judgment.

### ii.  Lundquist and Neceskas

Earl has likewise failed to show that Lundquist and Neceskas were similarly situated to her.  The following quotation is Earl's entire discussion regarding Lundquist and Neceskas in the section of her Response addressing her Title VII claim:  "Plaintiff also points to the treatment of Mssrs. Lundquist and Neceskas. Both were terminated by H.D. Smith–but treated substantially differently than Pat [Earl].  They were not denied a severance packages, as was Plaintiff."

While not cited in her Response, Earl's deposition testimony states Lundquist was fired by Chris Smith for setting up an account even though he had

been told not to do so.  Lundquist's insubordination is not similar to the

misconduct for which Earl was terminated.  Moreover, Earl stated in her deposition

that Chris Smith fired Lundquist.  Chris Smith did not fire Earl, Dale Smith did.

Therefore, Earl has not shown she had the same supervisor as Lundquist.

With respect to Neceskas, Earl also testified in her deposition, but did not

cite in her Response, that she "believed" Neceskas was fired for "performance

issues" and given a six-month severance.  Earl's statement in her deposition that

she "believed" Neceskas was fired for "performance issues" is not sufficient to

show Neceskas and Earl were similarly situated.  First, describing Neceskas's

failing as a "performance issue" is not sufficient to show he engaged in similar

conduct to the conduct H.D. Smith terminated Earl for.  Second, Earl was not

involved in the decision to terminate Neceskas, only in the delivery of the message

to Neceskas that he was terminated.  Earl has made no showing that her "belief"

that Neceskas was fired for "performance issues" was within her personal

knowledge or that she had any legitimate basis for that belief.

## C.  Earl Has Not Shown H.D. Smith's Proffered Reasons For Its Actions Were Pretext For Gender Discrimination

Although not necessary to this Court's decision, this Court will also consider

whether Earl has raised a genuine issue of material fact with regard to whether

H.D. Smith's proferred reason for terminating Earl was a pretext for sex

discrimination.  Once a plaintiff establishes a *prima facie* case of discrimination (which the court assumes for purposes of this discussion), the defendant has the burden of offering a legitimate, nondiscriminatory reason for the adverse employment action.  Brewer v. Board of Trustees of the University of Illinois, 407 F.Supp.2d 946, 970 (C.D. Ill. 2005).  "After articulating a legitimate, non-discriminatory reason for its action, Defendant's 'burden is . . . quite light; the employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the *prima facie* case and puts the onus back on the plaintiff to prove pretext."  Graham v. Town of Normal, 2010 WL 582608, at *5 (C.D. Ill. 2010).  "Because a Title VII claim requires intentional discrimination, the pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate."  Helland v. South Bend Community Sch. Corp., 93 F.3d 327, 330 (7th Cir.1996).

To establish pretext, a plaintiff must provide some evidence that the employer did not "honestly believe the reasons given for [her] discharge."  Logan v. Caterpillar, Inc., 246 F.3d 912, 921 (7th Cir. 2001).  The plaintiff must show the employer's articulated reasons for its adverse employment actions: (1) had no basis in fact; (2) did not actually motivate the actions; or (3) were insufficient to motivate the actions.  Hughes v. Brown, 20 F.3d 745, 747 (7th Cir. 1994) (citation

omitted).  In attempting to show pretext, "[t]he plaintiff must specifically refute the facts which allegedly support the employer's proffered reasons."  <u>Collier v. Budd Co.</u>, 66 F.3d 886, 893 (7th Cir. 1995) (emphasis added, quotation omitted).

H.D. Smith's proffered reason for terminating Earl's employment was that Earl had knowledge of, and a role in, changes being made to a major contract after the authorized customer representative had signed the document.  In Smith's view, this amounted to a failure on Earl's part to perform her duties in a satisfactory manner, exposed H.D. Smith to liability, disregarded standard procedures, and called Earl's honesty and integrity into question.  In her Response, Earl has made no argument that H.D. Smith's proffered reason for terminating her is pretext.  Earl made no argument that Smith did not believe the reason given for Earl's discharge. Therefore, Earl has not shown sufficient evidence of pretext to survive a summary judgment motion.

As stated above, the denial of a severance package to Earl was not an adverse employment action.  However, even if the Court were to assume that it were, Earl has not established H.D. Smith's reason for denying a severance package was pretext.  Karen Galloway, the Vice President of Human Resources at H.D. Smith, submitted a declaration that stated the following:

> From time to time, the Company has offered severance packages to employees who have been terminated in exchange for

them signing release agreements.  These packages have been offered to both men and women.  For as long as I have been in a Human Resources capacity at the Company, I am unaware of any employee who has ever been found to have engaged in gross misconduct similar to that to the misconduct of Ms. Earl, who has [sic] offered a severance package.[5]

Earl has not come forward with any evidence to refute this statement.  In fact, Earl has made no argument whatsoever regarding the pretext prong of a discrimination claim under the indirect method.[6]

## **SUPPLEMENTAL JURISDICTION**

The Court notes that the only claims remaining in this case against H.D. Smith and D'Amaro are state law claims.  Section 1367(a) provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  District courts may decline to exercise supplemental jurisdiction over a claim under

---

[5] Galloway's Declaration also states that she has been Vice President of Human Resources at H.D. Smith since March 2010.  Before that, Galloway worked as H.D. Smith's Director of Human Resources.  In both capacities, Galloway had access to and experience with H.D. Smith's human resource policies and procedures.

[6] The statement that Earl has made no argument whatsoever in her Response regarding pretext applies to both H.D. Smith's reason for terminating her and denying her a severance package.

subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Here, Earl's Complaint alleged a cause of action based upon Title VII, which gave this Court original jurisdiction over the case.  However, summary judgment has now been granted in favor of Defendant H.D. Smith on Earl's only federal claims.  "'[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.'"  Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998) (quoting Wright v. Associated Ins. Cos., 29 F.3d 1244, 1251 (7th Cir. 1994).  "Cases involving difficult and unresolved issues of state law may well be adjudicated more accurately and more expeditiously in a state court."  Barron v. Lee Enterprises, Inc., 183 F. Supp. 2d 1077 (C.D. Ill. 2002) (citing Centres, Inc. v. Town of Brookfield, Wis., 148 F.3d 699, 704 (7th Cir. 1998).  Moreover, "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, are paramount concerns."  Barron, 183 F. Supp. 2d at 1089 (citing Kennedy, 140 F.3d at 728).  Based upon these considerations, this Court declines to exercise supplemental jurisdiction over Earl's remaining state law claims.

## CONCLUSION

THEREFORE, Defendant H.D. Smith's Motion for Summary Judgment (d/e 74) is GRANTED as to Counts I and II only.  Because judgment has been entered on Earl's only federal claims, this Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Earl's remaining claims, Counts III, IV, VI, and VII, are DISMISSED WITHOUT PREJUDICE.  The dismissal of Counts IV and VI renders D'Amaro's Motion for Summary Judgment on those counts moot.  Therefore, D'Amaro's Motion for Summary Judgment (d/e 79) is DENIED AS MOOT.  Earl may refile her state law claims in state court pursuant to § 13-214 of the Illinois Code of Civil Procedure (735 ILCS 5/13-217).  This case is CLOSED.  The final pretrial conference scheduled for October 3, 2011, and the jury trial scheduled for November 1, 2011, are hereby VACATED.  The parties shall be responsible for their own court costs.

IT IS SO ORDERED.

ENTERED: September 8, 2011.

FOR THE COURT:

_____ s/ Sue E. Myerscough _____
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE